# EXHIBIT A

**<u>Exhibit B to Form DAB-101</u>**
**Affinity Care of Virginia LLC**

**Consolidated Request for Review of Administrative Law Judge Medicare Decisions
in ALJ Appeal Nos. 3-14843794464 & 3-14843794472**

**Reasons for Disagreement with the ALJ's Decisions**

The Appellant, Affinity Care of Virginia, LLC ("Hospice"), is appealing the two (2) unfavorable decisions dated August 8, 2025 ("Decisions")[1] issued by Administrative Law Judge Norman Jacobson, Jr. ("ALJ") in the above-referenced appeals following a telephonic hearing that took place on May 22, 2025 ("Hearing"). Specifically, the Hospice disagrees with the ALJ's denial of payment to the Hospice for its provision of hospice services to the three (3) patients (collectively, "the Patients") on the specific dates of service for which review is requested, as set forth in Exhibit A to Form DAB-101 ("Denied Dates"). The Hospice disagrees with the Decisions for reasons including, but not limited to,[2] the following:

1.      **<u>The Decisions are contrary to the evidence and not supported by substantial evidence.</u>**

Contrary to the ALJ's Decisions, the administrative record contains ample evidence that meets the Hospice's burden to show, by a preponderance of the evidence, that the Patients were terminally ill and eligible for hospice services during the Denied Dates. The record includes the **<u>certifications of terminal illness</u>** signed by the hospice physicians who treated the Patients and attested in writing to their eligibility in real time, as well as **<u>medical records</u>** supporting the relevant certifications. The record also contains **<u>undisputed written and verbal expert medical opinion testimony</u>**[3] confirming that the Patients all had terminal prognoses during the Denied Dates. During the Hearing, Laura Patel, MD, FAAHPM, HMDC, an independent, board certified hospice physician and certified hospice medical director ("Hospice Expert"), testified based on her review of the records that it was reasonable for the Hospice's certifying physicians to conclude, at the time of each applicable certification, that the Patients had prognoses of six months or less if their illnesses ran the normal course. The Hospice Expert also prepared detailed written testimony thoroughly describing each patient's condition and terminal prognosis for the ALJ's consideration.[4] In addition, the Hospice provided an **<u>expert declaration</u>** from the Hospice Expert explaining how experienced hospice physicians exercise clinical judgment by, among other things,

---

[1] The Decisions are cited herein as "Dec. 1" (for Appeal No. 3-14843794464) and "Dec. 2" (for Appeal No. 3-14843794472) with respective page numbers. *See* Exhibit A to Form DAB-101 for the specific Denied Dates covered in each Appeal No./Decision.

[2] The Reasons for Disagreement with the ALJ's Decisions outlined herein include non-exhaustive examples of the errors committed by the ALJ in the Decisions. The Hospice reserves the right to disagree with and take exception to additional comments made or conclusions reached by the ALJ, in the Decisions or during the Hearing, for reasons not set forth within this Exhibit in future appeal submissions. Moreover, the Hospice's Redetermination Requests, Reconsideration Requests, Position Statement, and all exhibits thereto are hereby incorporated by reference, as they summarize the Hospice's position in this appeal. The Hospice requested, but did not receive, copies of the case files.

[3] The Hospice Expert's curriculum vitae was included as an attachment to the Hospice's Response to Notice of Hearing dated April 29, 2025. In the Decisions, the ALJ recognized the Hospice Expert as the only "expert witness" to appear at the Hearing. *See* Dec. 1 p. 2; Dec. 2 p. 2.

[4] *See* Exhibits A-C to the Hospice's Position Statement dated May 16, 2025. During the Hearing, the Hospice Expert incorporated the content of her written testimony by reference into her sworn verbal testimony. Hearing Audio.

applying local coverage determination ("LCD") guidelines, to assess patient clinical eligibility for hospice services.[5]

The great weight of evidence supports that the certifying physicians' determinations regarding prognosis were reasonable, and that the services the Hospice provided to the Patients during the Denied Dates were appropriate. Against this substantial evidence demonstrating the propriety of the claims, there is essentially nothing; the administrative record does not contain *any* medical opinion evidence from the Centers for Medicare and Medicaid Services ("CMS") or its contractors refuting the determinations made by the certifying physicians or contradicting the Hospice Expert's testimony. Yet, the ALJ—based upon his own unqualified clinical determinations, and contrary to the overwhelming evidence, including the clinical judgment of the certifying physicians and the Hospice Expert's uncontested medical opinion testimony— concluded that the Patients were not terminally ill. Accordingly, the Decisions are wrong in light of the complete administrative record and must be overturned, as they are not supported by substantial evidence. For example:

   A. **The ALJ improperly made clinical inferences and reached medical conclusions regarding the Patients' prognoses without the knowledge, training, or experience necessary to engage in prognostication.**

While ALJs may weigh the evidence in the administrative record (including any testimony provided), they *may not* make independent medical findings based on their own interpretation of the medical records.[6] The applicable statute, regulation, and Medicare Benefit Policy Manual make clear that the initial certification and all recertifications require the exercise of a *physician's* clinical judgment. It follows that only a trained hospice physician is competent to evaluate the reasonableness of other hospice physicians' eligibility determinations. In other words, non-physician ALJs are not and should not be permitted to reach clinical conclusions without the aid of medical opinion testimony from a qualified expert. The only qualified hospice expert appeared and testified on behalf of the Hospice.[7] Yet, the Decisions reveal the ALJ primarily relied on his own interpretation of the medical records, resulting in an inaccurate assessment of the Patients' prognoses and, therefore, flawed conclusions regarding their hospice eligibility and the necessity of the services they received. *See generally* Dec. 1 pp. 9-47; Dec. 2 pp. 10-21. In the absence of medical opinion testimony that the services provided were not reasonable and necessary, the ALJ's clinical inferences and conclusions amount to nothing more than mere speculation.

---

[5] *See* Exhibit D to the Hospice Position Statement dated May 16, 2025. The Hospice Expert also incorporated the content of her declaration by reference into her sworn verbal testimony. Hearing Audio.

[6] *See, e.g.*, *Hospice of E. Tex. v. Sec'y, U.S. Dep't of Health & Hum. Servs.*, 2025 WL 957519 (E.D. Tex. 2025) (adopting Report and Recommendations of Mag. J., Docket No. 31).

[7] "Laura Patel, MD and Board Certified in Hospice and Geriatric and Internal Medicine and expert witness appeared and participated for the Appellant.... No other recipients of the Notice of Hearing responded or appeared to participate in the hearing." Dec. 1 p. 2; Dec. 2 p. 2.

**B. The ALJ failed to evaluate the clinical judgment of the certifying physicians in the context of the complete administrative record, despite acknowledgment by Congress and CMS that the certifying physician's role is central to the Medicare hospice benefit.**

The ALJ is not permitted to substitute his own layperson's opinion for that of the experienced hospice physicians who contemporaneously treated the Patients and certified them as terminally ill and hospice eligible. Although certifying physicians' determinations regarding terminal prognosis are not entitled to presumptive weight, the ALJ was required to evaluate those determinations in the context of the evidence in the complete administrative record, including the Hospice Expert's testimony corroborating the underlying certifications.[8]

The Decisions here demonstrate the ALJ's unexplained disregard for the clinical judgment of the certifying physicians. *Even if* the ALJ were qualified to engage in prognostication (which he is not), the *post hoc* scrutiny of a certifying physician's clinical judgment is not enough to undermine that physician's prior hospice eligibility determinations. Rather, reversal of a certifying physician's hospice eligibility determination is appropriate *only if*, based on a reasonable interpretation of the relevant medical records, *no reasonable physician* applying his or her clinical judgment could have concluded that the patient was terminally ill. Nothing in the administrative record supports, nor do the Decisions assert, that no reasonable physician could have deemed each patient eligible.

**C. The ALJ improperly disregarded the Hospice Expert's unrebutted medical opinion testimony about the prognostic significance of the Patients' many well-documented debilities, diagnoses, and symptoms.**

Expert testimony is intended to clarify and contextualize the clinical judgment applied by the certifying physicians based on the information available at the time of certification, as documented in the medical records.[9] The ALJ acknowledged the Hospice Expert's appearance at the Hearing (Dec. 1 p. 2; Dec. 2 p. 2) and included excerpts of the Hospice Expert's written testimony to summarize "Appellant's Argument." *See* Dec. 1 pp. 10-13, 28-30, 39-41; Dec. 2 pp. 10-11, 15-16. However, the Decisions reveal that the ALJ ultimately disregarded the Hospice Expert's medical opinions, instead relying on his own layperson's understanding of the records to conclude that the Patients were not terminally ill. Copying and pasting portions of an expert's written medical opinion testimony, as the ALJ did here, *does not* demonstrate the requisite consideration of that testimony,[10] particularly given that the Decisions do not contain *any* analysis

---

[8] *See Hospice of E. Tex.*, 2025 WL 957519 ("While controlling weight need not be given the opinions of treating physicians, such opinions are nevertheless entitled to consideration on a Medicare determination, particularly if there is no physician evidence to the contrary.").

[9] For example, at the Hearing, the Hospice Expert explained fundamental hospice clinical measures and their relationship to terminality, such as the Palliative Performance Scale ("PPS"), the Functional Assessment Staging Tool ("FAST"), activities of daily living ("ADLs"), mid-arm circumference ("MAC"), and more. Hearing Audio. She also interpreted certain specific clinical information in the medical record and described the significance of that information in the complex context of hospice medicine. *Id*.

[10] Similarly, the ALJ's copying and pasting of certain medical records into the Decisions also does not demonstrate consideration of those specific records or the administrative record overall.

of or response to the information or conclusions presented therein.[11] Not only does the ALJ wholly fail to engage with the Hospice Expert's written testimony throughout the Decisions, there are also only minimal references to the Hospice Expert's uncontested, patient-specific verbal testimony provided at the Hearing. *See* Dec. 1 p. 36. The Hospice Expert explained the clinical significance of the information from the medical record and how, in her expert medical opinion, that information supported the Patients' hospice eligibility, while the ALJ (in failing to consider that medical expertise) overstepped the bounds of a lay person's competence in coming to his conclusions.

The Decisions do not explain *why* the ALJ disagreed with the Hospice Expert's medical opinions, despite the fact that no competent witness rendered a clinical assessment contrary to that of the Hospice Expert. CMS and its contractors are permitted by regulation to participate in hearings as a party to provide medical opinion evidence on behalf of CMS.[12] However, nobody from CMS or its contractors participated in the Hearing or provided contrary medical opinion evidence.[13] Notably, although the underlying decisions by the CMS contractors in this case are part of the administrative record, they are *not* medical opinion evidence. They were written by unidentified individuals with unknown credentials who were neither personally involved in the care of the Patients (like the certifying physicians), nor under oath or subject to cross-examination (like the Hospice Expert). To the extent that any of the underlying reviewers were not physicians, they were not competent to determine, based on a review of the medical records, what a reasonable physician would or would not conclude based on each patient's unique clinical circumstances. Because the underlying decisions and the rationales expressed therein do not constitute medical opinion evidence, they cannot be relied upon by the ALJ to refute the determinations made by the certifying physicians or the Hospice Expert. *Even if* the underlying reviewers were physicians (which is unsubstantiated[14]), the ALJ failed to provide any explanation of why their opinions were seemingly credited over that of the qualified Hospice Expert who appeared at the Hearing.

At no point during the Hearing or in the Decisions did the ALJ question the Hospice Expert's credibility or provide a reasoned basis for disregarding the Hospice Expert's conclusions about the Patients' terminality in favor of his own.[15] For each Patient, the ALJ noted the Hospice Expert's conclusion "to a reasonable degree of certainty that the medical record supported an

---

[11] Although the ALJ summarized the Hospice Expert's global testimony (*see* Dec. 1 pp. 7-9; Dec. 2 pp. 9-10), he also did not engage with or respond to that testimony. Again, the simple act of paraphrasing does not demonstrate any analysis or consideration on the part of the ALJ.

[12] *See* 42 C.F.R. § 405.1012.

[13] Although 42 C.F.R. § 405.1010(a)(2) indicates there can be no adverse inference if CMS chooses not to participate, CMS's absence nonetheless results in an absence of countervailing expert testimony on which an ALJ can rely. *See, e.g.*, *State v. Jimenez*, 160 Idaho 540, 544 (Idaho 2016) ("There is a difference between drawing an adverse inference and recognizing the lack of evidence" and that where defendant was not required to, but could have presented evidence, "the court could certainly take into consideration the lack of such evidence.").

[14] The ALJ appears to believe that the redetermination decision was prepared by a physician. *See* Dec. 1 pp. 12, 29, 40 (referring to the Medicare Administrative Contractor's "physician reviewer"). However, nothing in the administrative record includes the names or credentials of the underlying reviewers. Given this, as well as CMS's non-appearance at the hearing, the Hospice Expert's medical opinions were uncontested (*i.e.*, there is no direct contrary medical evidence in the record to discount either the certifying physicians' clinical judgment or the Hospice Expert's testimony).

[15] ALJs can reject uncontested expert opinions that are inconsistent, insufficiently explained, or contrary to the objective clinical evidence. However, the ALJ made no assertion that the Hospice Expert's testimony was any of the above.

ongoing prognosis of six months or less if the illness ran its course." Dec. 1 pp. 13, 30, 41; Dec. 2 pp. 11, 16. Yet, in each case, the ALJ concluded matter-of-factly—without sufficient explanation or evidentiary support, and without rebutting or giving any basis to discredit the Hospice Expert's contrary findings—that the documentation "fail[ed] to establish a prognosis of six months or less." Dec. 1 pp. 26, 37, 47; Dec. 2 pp. 14, 20.

2.    **The ALJ failed to apply the correct legal standards governing clinical eligibility for hospice services, thereby rendering Decisions that are contrary to law.**

When ruling on questions of evidence and making factual and legal determinations, ALJs must fully and independently examine the issues based on the complete administrative record to render impartial decisions in accordance with applicable law. ALJs are bound by the Administrative Procedure Act ("APA"), Medicare statutes and regulations, precedential decisions of the Medicare Appeals Council, rulings issued by CMS, and relevant case law. In this case, the ALJ incorrectly applied or altogether ignored several fundamental legal principles governing hospice eligibility determinations and the later evaluation of those determinations, as examined below. In doing so, he created a new, more stringent legal standard of which the Hospice had no notice, in violation of the rulemaking requirements of the Medicare Act and the APA.[16]

A. **The ALJ failed to apply or, alternatively, misapplied the local coverage determination guidelines.**

LCDs set forth coverage indications (*i.e.*, clinical variables) that generally support a terminal prognosis to serve as "useful framework[s]" to assist in physician decision-making regarding eligibility.[17] Although meeting LCD guidelines demonstrates terminality, failure to meet LCD guidelines *does not* necessarily rule out terminality and, therefore, does not preclude hospice eligibility. In other words, although ALJs must—in "substantial deference" to LCDs under 42 C.F.R. § 405.1062(a)—approve claims whenever LCD guidelines are met, ALJs cannot deny claims simply because a patient does not meet LCD guidelines. The applicable CGS Administrators, LLC ("CGS") LCD guidelines for Hospice Determining Terminal Status (L34538) explicitly state that "[s]ome patients may not meet these guidelines, yet still have a life expectancy of six months or less. Coverage for these patients may be approved if documentation otherwise supporting a less than six-month life expectancy is provided." Therefore, if an ALJ concludes that a patient does not meet LCD guidelines, the ALJ must consider *all* prognostically relevant factors documented in the record, including those outside the confines of the LCD itself, before reaching a conclusion about clinical eligibility.

Per the LCD, a "patient will be considered to have a life expectancy of six months or less" if they meet *either* of two alternate pathways: (a) the Part I "Decline in Clinical Status" guidelines, *or* (b) the Part II Non-Disease Specific Baseline Guidelines plus the applicable Disease Specific guidelines contained in the Appendix. The application of the LCD to a particular patient's

---

[16] The APA allows agency findings, including ALJ decisions, to be set aside if they are arbitrary and capricious (*i.e.*, demonstrate the application of incorrect legal standards).

[17] Medicare Program: Changes to the Medicare Claims Appeal Procedures, 70 Fed. Reg. 11419, 11458 (March 8, 2005). *See also* L34538 (stating the LCD guidelines "are intended to be used to identify any Medicare beneficiary whose current clinical status and anticipated progression of disease is more likely than not to result in a life expectancy of six months or less.").

circumstances is a complex clinical analysis that requires the appropriate medical knowledge, skill, and experience. For that reason, only a physician can determine—using their clinical judgment—what frequency, severity, or combination of symptoms and conditions are "sufficient" to meet LCD guidelines or otherwise support a prognosis of six months or less. Part I of the LCD lists factors that are "predictive" of a terminal prognosis but recognizes that "[n]o specific number of variables must be met," and "[o]ther clinical variables not on th[e] list may support a six-month or less life expectancy." L34538. Therefore, although the enumerated variables *may* support terminality in certain clinical scenarios, a patient does not need to demonstrate every variable listed to be eligible under Part I of the LCD guidelines, and other non-LCD factors can contribute to a terminal prognosis. Similarly, Part II of the LCD states that use of the word "should" in the disease specific guidelines contained in the Appendix means the guideline should be considered when evaluating eligibility, but "[i]t *does not* mean…that meeting the guideline is obligatory." L34538 (emphasis added). In other words, the LCD guidelines are flexible and intentionally give certifying physicians leeway to exercise their clinical judgment. In fact, CMS has expressly rejected the idea that there are clinical "criteria" that must be satisfied to certify a hospice patient as terminally ill.[18]

Despite the LCD's clear instructions, and without refuting (or even acknowledging) the Hospice Expert's testimony that the Patients actually did meet LCD guidelines under one or more pathways (Hearing Audio[19]), the ALJ improperly expected the records to reflect *every LCD factor* in order to support terminality. Throughout the Decisions, the ALJ acknowledged the Patients' numerous signs or symptoms of decline, but then denied the claims based on the alleged absence of *the other* enumerated signs and symptoms. *See generally* Dec. 1 pp. 22-26, 35-37, 45-47; Dec. 2 pp. 19-22 (denying claims based on a purported absence of poor appetite, pain, skin integrity issues including wounds or pressure ulcers, dysphagia leading to aspiration, dyspnea, decreasing MAC, cough, falls, declining PPS score, unstable vital signs, hospitalizations, infections, etc.). *See also, e.g.*, Dec. 1 p. 47 ("Overall, the Beneficiary had a stable decline in function, such as through the need for supplemental oxygen and incontinence, while not showing decline in other areas through declining measurements, infections, changes in consciousness, or aspiration, cough, or dysphagia resulting in decreased oral intake."). Moreover, even when certain LCD factors were undeniably present, the ALJ ignored or minimized their impact on prognosis, erroneously concluding that those factors were somehow insufficient to meet the LCD guidelines, in direct contravention to the Hospice Expert's unrefuted medical opinion testimony. *See* Dec. 1 pp. 23, 24-25, 26, 46, 47 (stating that "[t]he medical record fails to support a prognosis of six months or less under the guidance in the LCD" and/or that "the record simply fails to [show or document] a terminal prognosis under the guidance"); *see also* Dec. 1 p. 25 (commenting the ALJ's "findings

---

[18] In 2008, CMS announced a rule specifying what hospice medical directors "must consider" when making an initial certification. *See* 42 C.F.R. § 418.102(b). CMS initially proposed labeling these considerations "criteria," but removed that word "in order to remove any implication that there are specific CMS clinical benchmarks in this rule that must be met in order to certify terminal illness." *See* Medicare and Medicaid Programs: Hospice Conditions of Participation, 73 Fed. Reg. 32088, 32138 (June 5, 2008).

[19] *See also* Exhibits A-C to the Hospice's Position Statement dated May 16, 2025. The Hospice Expert's written testimony included detailed descriptions of how each patient's condition met LCD guidelines (in paragraph and chart form). Specifically, the Hospice Expert testified (in writing and at the Hearing) that all three Patients met the Part I decline in clinical status guidelines, and Patient L.S. also met the Part II non-disease specific baseline guidelines and the disease-specific guidelines for pulmonary disease listed in the Appendix. This testimony and the Hospice Expert's ultimate conclusions regarding eligibility under the LCD was notably absent from the ALJ's copy/paste summary of "Appellant's Arguments." *See* Dec. 1 pp. 10-13, 28-30, 39-41; Dec. 2 pp. 10-11, 15-16.

fail to satisfy the decline in clinical status criteria in the LCD"); Dec. 1 pp. 13, 36 (containing similar verbiage).

*Even if* the ALJ had the proper credentials to independently conclude or, alternatively, a sufficient evidentiary basis to support that the Patients did not meet LCD guidelines (which he does not), he was then required to consider all prognostically relevant factors documented in the record and presented in the Hospice Expert's testimony before determining the Patients were not terminally ill. Instead, the ALJ improperly treated the LCD guidelines as an absolute requirement, denying the Patients' claims solely because, in his own unqualified interpretation of the record and flawed application of the LCD, the documentation did not meet those guidelines. *See, e.g.*, Dec. 1 pp. 22-26, 36-37, 46; Dec. 2 p. 20 (repeatedly referring to the factors in the LCD *guidelines* as "criteria"[20]). This misapplication of the LCD guidelines cannot stand.

### B. The ALJ failed to consider each Patient's complete medical picture when evaluating the administrative record.

Eligibility determinations, and subsequent reviews of those determinations, must take into consideration not just a patient's diagnosis, but their *prognosis*. Although applicable law and guidance use varied terminology to describe prognosis (*e.g.*, whole condition, individual clinical circumstances, unique clinical picture, the total person, etc.), it is clear that prognosis derives from the combined effects of *all* a patient's diagnoses, symptoms, and conditions (*i.e.*, the primary hospice diagnosis and all secondary or comorbid conditions, including those that are acute and chronic, whether controlled or uncontrolled). In this case, the ALJ repeatedly ignored or minimized many well-documented clinical factors that the certifying physicians and the Hospice Expert identified as supportive of a terminal prognosis.[21] As just one example, the ALJ's analysis of Patient J.F. disregarded his recurrent serious infections, including an upper respiratory infection in June 2022, an acute COVID-19 infection in January 2023, and a history of recurrent ear and urinary tract infections with septicemia (sepsis) that were well-documented in the record. These findings, in combination with progressive decline in PPS from 40% to 30%, increased functional dependence, and persistent edema (among others) were all identified by the Hospice Expert as supporting a terminal prognosis, yet overlooked or dismissed by the ALJ. *See* Dec. 1 pp. 22-27. Instead, the ALJ focused on an alleged absence of pain, unstable vital signs, wounds, and "respiratory concerns" as a basis to deny Patient J.F.'s claims. The ALJ committed similar errors in his assessment of Patients R.K.'s and L.S.'s prognoses and hospice eligibility.

Without describing the significance (or lack thereof) of the seemingly arbitrarily selected clinical data points included in the Decisions (many of which actually support, not refute, the Patients' terminal prognoses under the LCD guidelines and otherwise), the ALJ jumped to his ultimate conclusion that the patients were not eligible. It is inconsistent with CMS directives for the ALJ to place undue weight on certain factors cherry-picked from the medical records while

---

[20] *See* note 18, *supra.*
[21] This includes factors both within and beyond the LCD guidelines.

simultaneously ignoring or downplaying key information bearing on the Patients' overall conditions and, therefore, their prognoses.[22]

### C. The ALJ improperly imposed a clinical "decline" requirement.

Nothing within the applicable statutes, regulations, or CMS guidance requires a decline in condition during each month of service, or even each benefit period, for a patient to remain eligible for hospice services. To the contrary, CMS has acknowledged that not all patients will show measurable decline at each recertification. Moreover, an apparent improvement or stabilization (*i.e.*, an apparent lack of decline) in a patient's *symptoms* may not mean that their *prognosis*, on which hospice eligibility is based, has improved. Therefore, lack of decline or perceived stabilization during a single month or benefit period is not, in itself, a proper reason to conclude a patient is not terminally ill. Despite this, the ALJ improperly denied the Patients' claims based on his own perceived lack of decline. For example:

- The ALJ expected to see certain specific symptoms or declines that the Patients allegedly did not experience during the Denied Dates, irrespective of each patient's primary hospice diagnosis and unique clinical picture. *See generally* Dec. 1 pp. 22-26, 35-37, 45-47; Dec. 2 pp. 19-22. *See also* Dec. 1 pp. 9-47; Dec. 2 pp. 15-21 (repeatedly commenting on a lack of "apparent distress" or "abnormal" findings). Depending on a particular patient's overall clinical circumstances, factors such as pain, decubitus ulcers, dyspnea, etc. *could* support a terminal prognosis if present. Contrary to the ALJ's suggestion, however, their absence does not demonstrate a lack of terminality (as described above).

- The ALJ determined, without the proper qualifications or evidentiary support, that the declines that *were* documented in the medical record and addressed in the Hospice Expert's testimony were insufficient to support the Patients' hospice eligibility. *See generally* Dec. 1 pp. 9-47; Dec. 2 pp. 15-21 (acknowledging the Hospice Expert's testimony "that the medical record supported an ongoing prognosis of six months or less" and commenting on numerous documented indicators of debility and decline, yet repeatedly denying claims because the Patients' symptoms or conditions were "stable"/"unchanged" or did not demonstrate "significant" or "consistent"/"continued" declines). *See also* Dec. 1 p. 23 (recognizing "functional status decreased to the point of two persons being required for ambulation[,]...KPS and PPS decreased to 30%[,] and FAST score [worsened] from 6A to 6E," but concluding that "[d]espite these declines, the record still fails to demonstrate terminal prognosis and a life expectancy of six months or less."); Dec. 1 p. 37 ("The administrative record again demonstrates concerns and decline, as the Appellant states, but without a terminal prognosis and life expectancy of six months or less."); Dec. 2 p. 20 ("While certain clinical indicia of decline were reported, these declines were slow and represented longstanding functional impairments."). It is unclear from the Decisions why or how the ALJ deemed certain data points inadequate or insignificant.

---

[22] *See Hospice of E. Tex.*, 2025 WL 957519, at *19 (overturning the ALJ's decision, in part, because it "improperly overemphasize[d] some considerations (*e.g.*, absence of decline discussed below) and underemphasize[d] other considerations (such as comorbidities identified in the medical records and by [the hospice's expert physician]))."

- The ALJ incorrectly interpreted any apparent stabilization as indicative of a change in prognosis and a lack of terminality, even when further decline was unlikely or not possible given the patient's condition or expected disease trajectory. CMS guidance and the applicable LCD indicate that patients remain eligible for hospice care despite stabilization or improvement unless their overall condition changes to an extent "such that he/she no longer has a prognosis of six months or less."[23] Here, the administrative record contains ample support that any stabilizations in discrete symptoms referenced by the ALJ were the result of consistent, quality care provided by the Hospice that could not have been achieved or maintained outside of the hospice setting and *did not* indicate an improved prognosis or lack of terminality during the Denied Dates.

3.     **The ALJ failed to limit or waive the Hospice's liability as required under Sections 1879 and 1870 of the Social Security Act.**

The Hospice provided overwhelming evidence that it reasonably relied on the sound clinical judgment of its experienced hospice physicians that the Patients were terminally ill and eligible for hospice services. Accordingly, the hospice services provided were reasonable and necessary and should be paid by Medicare. However, even if the Hospice did not demonstrate the propriety of these claims (which the Hospice disputes), it is *still* entitled to payment pursuant to Sections 1879 and 1870 of the Social Security Act ("Act"). The ALJ failed to truly consider or properly apply the Act's limitation of liability and waiver provisions in this case. For example:

- The Decision does not include an analysis of the Hospice's liability for Medicare payments under Sections 1879 or 1870. Instead, the ALJ concluded matter-of-factly that, because the Hospice is a Medicare provider, it "is expected to know the requirements of Medicare claims" and, therefore, "knew or should have known that payment would not be made in this matter." *See* Dec. 1 pp. 26, 37, 47; Dec. 2 pp. 14, 20. The ALJ neglected to explain how mere knowledge of "applicable LCD and other Medicare guidance and authorities" equates to knowledge that *these particular Patients* were not terminally ill. Prognostication involves the clinical judgment of a physician regarding the unique, complex clinical circumstances and expected disease trajectory of each individual patient, *not* just the application of general "Medicare rules and policies." Stated succinctly, "[i]t would be unfair to expect a hospice to correctly predict how an ALJ would always rule in this uncertain and complicated area based simply on the receipt of non patient-specific material from CMS."[24]

- The ALJ's interpretation and application of the Act's limitation of liability and waiver provisions renders those provisions mere surplusage. It is irrational to believe that Congress enacted 1879(g)(2) with the intent that it could never be applied because the government publishes its laws and guidance materials. Similarly, if the mere fact that the Hospice is a Medicare provider was sufficient to put the Hospice on notice that these

---

[23] L34538 ("[P]atients in the terminal stage of their illness who originally qualify for the Medicare hospice benefit but stabilize or improve while receiving hospice care, yet have a reasonable expectation of continued decline for a life expectancy of less than six months, remain eligible for hospice care."). *See also* 70 Fed. Reg. 50452, 50471 (Aug. 22, 2014).

[24] *Hospice of E. Tex.*, 2025 WL 957519.

specific Patients' certifications of terminal illness were somehow unreasonable, the 1870 waiver would be completely superfluous.[25]

– The Decisions and the record as a whole fall far short of showing that the Hospice had reason to expect that the clinical judgment of the certifying physicians regarding the Patients' terminal prognoses was likely to be rejected, or that the Hospice was unreasonable in accepting payment for the services provided. The Hospice is entitled to payment under Sections 1879 and/or 1870 because the overwhelming evidence demonstrates it did not and *could not* have reasonably been expected to know that the Patients would later be determined not to be terminally ill, and it is without fault because it had a reasonable basis for assuming payment was correct.[26]

### 4.    The ALJ improperly upheld meritless technical denials based on his own documentation preferences which exceed applicable legal requirements.

In addition to the numerous flaws in the Decisions described above, the ALJ also erred by upholding a meritless technical denial pertaining to certain dates of service for Patient R.K.[27] The ALJ determined that the face-to-face ("F2F") encounter documentation pertaining to the April 26, 2022, through June 24, 2022, benefit period "fail[ed] to meet...criteria." Dec. 1 pp. 35-36; Dec. 2 pp. 13-14. Like the reviewers below, the ALJ rejected the F2F documentation because it contained a "typed signature and date, which could not be authenticated since there was not an entry identifying it as an electronic signature." Dec. 1 p. 35; Dec. 2 p. 13.

As explained in the Hospice's Position Statement, Patient R.K.'s F2F documentation meets the requirements of 42 C.F.R. § 418.22(b)(4). The regulation governing F2F encounters requires only that the physician or nurse practitioner that performs the F2F "attest in writing that he or she had a face-to-face encounter with the patient, including the date of that visit."[28] Here, the F2F documentation included the date of the visit (March 30, 2022) *twice* within the form and was signed by nurse practitioner Jennifer Hauser.[29] Further, the F2F signature fully adhered to CMS's guidance regarding electronic signatures. The Medicare Program Integrity Manual ("MPIM") states only that "providers need a system and software products that are protected against modification, etc., and should apply adequate administrative procedures that correspond to recognized standards and laws."[30] Although CGS's website[31] says that "[e]lectronic signatures

---

[25] *See id.* (noting a conclusion that Section 1870 does not apply because the Hospice is "a participating provider in the Medicare program" is insufficient because "Section 1870 would be essentially null and void because presumably only Medicare providers would be applying for waiver of recoupment.").

[26] The ALJ provided no analysis regarding, and cited no evidence supporting, that the Hospice "did not exercise reasonable care" in billing the subject claims. *See* Dec. 1 pp. 26, 37, 47; Dec. 2 pp. 14, 20.

[27] In the decisions issued by the reviewers below, Patient R.K.'s April 26, 2022 through May 31, 2022 dates of service were denied solely for technical reasons, meaning there is no dispute that Patient R.K. was terminally ill during those dates. Dates of service June 1-24, 2022 were denied for clinical and technical reasons. All other Denied Dates for Patient R.K. (*i.e.*, June 25, 2022 through September 20, 2022) were denied based only on an alleged lack of clinical eligibility for hospice services.

[28] 42 C.F.R. § 418.22(b)(4).

[29] *See* Exhibit E to the Hospice's Position Statement dated May 16, 2025.

[30] MPIM, CMS Pub. No. 100-08, Ch. 3, § 3.3.2.4.B.

[31] *See* CGS Administrators, LLC, *What Are Acceptable Electronic Signature Notations?*, https://www.cgsmedicare.com/articles/cope4541.html.

should contain date and timestamps and include printed statements" such as "[e]lectronically signed by," these are merely CGS's *preferences*—there is no actual legal requirement that electronic signatures appear in this particular format to be compliant and valid.

Because the F2F documentation met legal requirements, the ALJ should have overturned the underlying technical denials. However, the ALJ ignored the Hospice's arguments and legal support and upheld the meritless technical claim denial. The underlying reviewers and ALJ are not permitted to impose documentation requirements on the Hospice above and beyond those set forth under law. A departure from CGS's or the ALJ's specific preferences cannot be a basis for denial of payment to the Hospice for the services provided.